1
2
3
4
5
6
7
8
9

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

10   UNITED STATES OF AMERICA,

11        Plaintiff,                                    Case No. 3:73-cv-00031-LDG

12   v.                                                 **ORDER**

13   ORR WATER DITCH CO.,, *et al*.,

14        Defendants.

15   _____

     Re: Petition to Amend or Modify Orr
16   Ditch Decree

17

18        As the Court has previously recognized, there exists on a river system:

19        a conflict between the pure theory of priority rights and the
          practical realities of the river system.  In effect, this conflict is
          between the priority concept and the well-established principle
20        of western water law that water must be economically,
          practically and beneficially used, so far as is possible. In this
21        Court's view, the waste of water must be avoided, for wasted
          water benefits no one.  Thus, the pure priority concept, which
22        would waste large amounts of water and other resources were it
          to be strictly applied, must be modified.

23   *United States v. Alpine Land & Res. Co.*, 503 F.Supp. 877 (D. Nev. 1980).  The Final

24   Decree in this matter–the Orr Ditch Decree–embodies just such a modification, adjudging

25   not only ownership and priority of water rights, but further establishing that such rights are

26

1  subject to an obligation to divert only that amount of water that can be reasonably,

2  economically and beneficially used.  Management of a river system both protects vested

3  water rights and furthers the efficient, beneficial use of water.  To this end, the Orr Ditch

4  Decree incorporated the Truckee River Agreement, which provides (among other things) a

5  management framework for the operation of the river system through the upstream storage

6  and release of the waters.

7      Presently before the Court is a motion to amend or alter the Orr Ditch Decree.  The

8  Moving Parties ask this Court to adopt the Truckee River Operating Agreement (TROA),

9  and supercede (with certain exceptions) the Truckee River Agreement (TRA) as the

10  operating agreement for the river system.  The Moving Parties indicate that the proposed

11  modifications will govern the operation of reservoirs on the river system, will modify

12  provisions concerning the "Floristan Rates," will implement an interstate allocation of the

13  waters of the Truckee River and Lake Tahoe basins, and will address claims of the

14  Pyramid Lake Paiute Tribe to the remaining waters of the Truckee River water.  The motion

15  has been opposed.  Having carefully considered the motion, all oppositions, and the

16  exhibits, and the record of this litigation, the Court will grant the motion as requested.

17      The Amended Motion to Alter or Amend the 1944 Final Decree (#1173) was filed by

18  the United States of America, the State of Nevada, the State of California, the Pyramid

19  Lake Paiute Tribe (Pyramid Tribe), the Truckee Meadows Water Authority (Water

20  Authority), the Washoe County Water Conservation District (Conservation District) and the

21  City of Fernley (collectively, the Moving Parties) pursuant to Section 205(a)(4) of the

22  Truckee-Carson-Pyramid Lake Water Rights Settlement Act of 1990, Title II, Public Law

23  101-618, 32 Stat. 3294, 3306 (the Settlement Act), and Rule 60(b)(5) of the Federal Rules

24  of Civil Procedure.  Previously, the Court determined that the Moving Parties were required

25  to provide notice of this motion to all owners or potential owners of Decreed water rights.

26  The Court further determined that such notice would be sufficient if (a) it provided each

2

1   owner or potential owner of a Decreed water right with a short and plain statement

2   summarizing the motion and the relief being sought, (b) it provided notice as to the

3   methods by which each owner could readily access and read the full text of all relevant

4   documents filed pertaining to this motion, and (c) and the Moving Parties provided a means

5   by which each owner could readily access and read the full text of all filed documents.  The

6   Court further required procedures to ensure that all owners of Decreed water rights who

7   elected to participate in the prosecution of this motion would have a means to be notified

8   when documents were filed, would have a means to obtain a copy of such documents, and

9   would have an opportunity to file responses.  Oppositions to the motions have been filed by

10   the Truckee-Carson Irrigation District (TCID) (#1469) (which opposition was joined by the

11   City of Fallon (#1466) and Churchill County (#1474)), and respondents represented by

12   Schroeder Law Offices (Schroeder Respondents) (#1465).  Respondents represented by

13   Martin Crowley of American Legal Services joined (#1475) the oppositions of both TCID

14   and the Schroeder Respondents.  In addition, responses have been filed by numerous

15   owners of Decreed water rights who have elected to participate in these proceedings.  See

16   ## 1217 - 1355, 1357 - 1360, 1364.

17          As instructed by the United States Supreme Court in *Rufo v. Inmates of Suffolk*

18   *County Jail*, 502 U.S. 367, 384 (1992), the modification of a consent decree is warranted

19   when changes in either factual conditions or the law – or a combination of both – make

20   compliance with the decree substantially more onerous, the decree proves unworkable

21   because of unforeseen obstacles, or when continued enforcement of the decree without

22   modification would be detrimental to the public interest.  In light of this standard, and as

23   further set forth in *Rufo*, a party seeking to modify a consent decree has the burden of

24   showing (a) that changes in legal and factual circumstances warrant a modification, and (b)

25   the proposed modification is suitably tailored to the changed circumstances.

26

3

1      Both TCID and the Schroeder Respondents have raised various arguments

2  suggesting that this Court's authority to modify the Orr Ditch Decree is limited.  They

3  suggest the TRA remains a legally enforceable contract separate from the Orr Ditch

4  Decree.  As such, the terms of the TRA cannot be modified by this Court without the

5  consent of all parties to that agreement, and all parties have not consented to the proposed

6  modifications.  The arguments are without merit.  This Court has authority to modify all

7  provisions of the Orr Ditch Decree, including those of the TRA, because the TRA no longer

8  remains a contract separate from the Orr Ditch Decree, but was incorporated into the

9  Decree.  The United States, TCID, Washoe County Water Conservation District, Sierra

10  Pacific Power Company, and individual water users signed the TRA.  The TRA parties then

11  filed the TRA with this Court and requested that it be incorporated into the Orr Ditch

12  Decree.  The Court granted that request, adopted the TRA, and made it part of the Orr

13  Ditch Decree.  In so doing, the TRA no longer existed solely as a contract between parties,

14  but became part of a judicial decree subject to this Court's continuing jurisdiction of this

15  action.  As such, this Court has authority to determine whether legal and factual

16  circumstances have changed, whether those changes warrant modification of the Orr Ditch

17  Decree (including those provisions incorporated from the TRA), and whether the proposed

18  modifications are suitably tailored to the changed circumstances.

19      The Moving Parties have submitted extensive evidence establishing both legal and

20  factual changes in the circumstances of the Truckee River system since the entry of the

21  Orr Ditch Decree.  TCID concedes, and the Schroeder Respondents do not dispute, that

22  changes in the law and facts have occurred since the Orr Ditch Decree was entered.

23  Broadly stated, since the Orr Ditch Decree was entered, additional reservoirs in the

24  Truckee River basin have been constructed and are being used for the management of

25  water on the river system.  Public awareness has increased, and has been acted upon,

26  regarding the need to protect and preserve species, and to protect the quality of the

1    environment.  The United States has enacted legislation protecting species and water

2    quality.  The fish of Pyramid Lake have been legally listed for protection.  The beneficial

3    use of water has shifted (and continues to shift) away from agriculture and toward

4    municipal and industrial uses, and other uses.  The population depending on the water of

5    the Truckee River has increased greatly and will continue to grow, while farmland irrigated

6    with diverted water has decreased.  The recognized beneficial uses of water have

7    increased to include (among other uses) fish, wildlife and wetland purposes, water quality,

8    and recreation.  Efforts have been initiated and pursued to better manage the river

9    consistent with Decreed water rights, with some emphasis placed on increasing the

10   quantity and quality of water flowing in the Truckee River to Pyramid Lake to enhance

11   spawning flows.  Litigation has resulted in judicial determinations affecting the manner in

12   which water has or can be used.  The necessity of maintaining a minimum flow in the

13   Truckee River for purposes of generating electricity has dwindled.  Congress enacted the

14   Settlement Act, and in so doing recognized (a) the need to modify the management

15   framework for operation of the river system, (b) the need to establish an interstate

16   allocation of the waters of the Lake Tahoe and Truckee River basins as between California

17   and Nevada, and (c) the need to resolve litigation concerning the Pyramid Tribe's

18   appropriation of water rights.  In the Settlement Act, Congress directed the Secretary of the

19   Interior to negotiate an operating agreement with the states of Nevada and California (after

20   consultation with other parties designated by these sovereign parties).  Congress further

21   directed, in the Settlement Act, that the operating agreement shall provide for the operation

22   of the river system to satisfy dam safety and flood control requirements; to provide for the

23   enhancement of spawning flows in the Lower Truckee River for the Pyramid Lake fishery;

24   to carry out the terms, conditions, and contingencies of the Preliminary Settlement

25   Agreement as modified by the Ratification Agreement, to ensure that water is stored in and

26   released from Truckee River reservoirs to satisfy the exercise of water rights in

1  conformance with the Orr Ditch Decree and the Truckee River General Electric Decree.

2  Congress also indicated, in the Settlement Act, that the operating agreement could include

3  (but was not limited to) provisions regarding the administration of the operating agreement;

4  means to assure compliance with the Preliminary Settlement Agreement; operations and

5  procedures for using federal facilities to meet the Secretary's responsibilities under the

6  Endangered Species Act; operations of the river system that would not be changed;

7  methods to diminish the likelihood of Lake Tahoe dropping below its natural rim;

8  procedures for management and operation of the Truckee River reservoirs; procedures for

9  operation of the Truckee River reservoirs for instream beneficial uses; operation of other

10  reservoirs in the Truckee River basin to the extent the owners of affected storage rights

11  become parties to the operating agreement; and procedures and criteria for implementing

12  the interestate allocation of Truckee River water.  Over the span of 20 years, the Moving

13  Parties participated in the negotiations, and ultimately agreed upon the Truckee River

14  Operating Agreement for the operation of the Truckee River system.

15      TCID briefly observes that some of the changes identified by the Moving Parties

16  were expected, that some of the changes were gradual, and that many of the changes

17  occurred or began many years ago, including as soon as the Orr Ditch Decree was

18  entered.[1]  The Court, however, is not limited to considering only changed circumstances

19  that are unexpected or sudden, or of recent vintage, in determining whether the changes

20  that have occurred since the entry of the Orr Ditch Decree render compliance with the

21  Decree substantially more onerous, or in determining if the continued enforcement of the

22  Decree without modification is detrimental to the public interest.  Rather, in determining

23  whether modification is warranted, the Court must consider all changed circumstances,

24

25      [1]    TCID also asserts that it disputes the Moving Parties' statements regarding
26  changed circumstances, but it offers no evidence that the changed circumstances identified
    by the Moving Parties have not occurred.

6

1   including the totality of all changed circumstances (regardless of whether some of those

2   changed circumstances were expected, occurred long ago, or accrued slowly) since the

3   signing of the Orr Ditch Decree.

4           The proposed modifications to the Orr Ditch Decree seek the adoption of the TROA

5   (superceding the TRA) as the management framework for the river system.  As this Court

6   has previously recognized, one of the critical tasks before this Court is to decide whether

7   the management framework established in the TROA, as established within the four

8   corners of that document and its protections to existing Orr Ditch Decreed Water Rights, is

9   suitably tailored to the changed circumstances.  The Court need not determine whether the

10  TROA is perfectly tailored to the changed conditions, but only whether it is suitably tailored

11  to the changed circumstances.[2]

12          As is apparent from the arguments of the parties, and from a review of the TRA, a

13  fundamental aspect of the TRA is the maintenance of the Floristan or Reduced Floristan

14  Rates through the release of water from Lake Tahoe and Boca Reservoir.  The Moving

15  Parties argue that the maintenance of the Floristan (or Reduced Floristan) Rate prescribed

16  by the TRA has become onerous and contrary to public interest as a result of the changed

17  circumstances of the river system.  Generally summarized, the Moving Parties argue that

18  the flow rate required by the TRA is not responsive to the changing beneficial uses to which

19  the water of the Truckee River is and will be placed.  For example, as recognized in the

20  Settlement Act, an operating agreement for the river system must provide for enhancing

21  spawning flows in the Lower Truckee River.  The Moving Parties assert that achieving a

22

23          [2]      In opposing the motion, TCID argues that the TROA violates the TRA as
    incorporated into the Orr Ditch Decree.  Without doubt, the TROA includes provisions that
24  conflict with the TRA, but such conflict does not establish a "violation" of the Orr Ditch
    Decree.  Rather, the Court has considered each conflict in determining that the conflicting
25  proposed modifications are suitably tailored to the changed circumstances. As a result, the
    conflicts identified by TCID are necessarily resolved by superceding the conflicting
26  provisions of the TRA.

7

1   flow conducive to the requirements of water users, while constrained by the Floristan Rates
2   as required by the TRA, has become onerous.

3        The opposing parties assert that the Floristan Rates can be modified under the TRA.
4   As TCID points out, however, any modification to the Floristan Rates under the TRA
5   requires the mutual consent of TMWA (as successor to Sierra Pacific Power), the
6   Conservation District, and TCID (and any reduction below Floristan Rates is limited to the
7   period between April 1 and October 31).  Ironically, TCID also argues, elsewhere in its
8   opposition, against the TROA's provisions for dispute resolution, which require that all
9   disputes under the TROA be first submitted to the Truckee River Special Hearing Officer.
10  The decisions of the Hearing Officer are then reviewable by this Court.  The Hearing
11  Officer is appointed to a four-year term by the unanimous agreement of representatives of
12  the four Sovereign Parties (the United States, California, Nevada, and the Pyramid Tribe).
13  TCID asserts that "[t]hese provisions grant entirely too much decision making power for
14  managing the Truckee River to the TROA Signatories."  The Court disagrees.  The
15  appointment of a Hearing Officer, which is required of the four sovereign parties, is an act
16  attenuated from the management of the river system.  Further, any hearings held by the
17  Hearing Officer are public, and the decisions can be reviewed by this Court.  By contrast,
18  the modification of the Floristan Rates directly affects the management of the river system.
19  The TRA, however, grants a unilateral veto to any proposed modification of the Floristan
20  Rates to each of just three entities, and provides no mechanism to review a veto by any of
21  those entities.  The provisions for management of the Floristan Rates by the three entities
22  was appropriate in 1944 when the Orr Ditch Decree was entered.  Under the changed
23  factual and legal circumstances, however, these same provisions now grant too much
24  decision-making power for managing the Truckee River to the three entities, and as such
25  have become onerous and unworkable for the operation of the river system.
26

8

1    In addition, the Orr Ditch Decree lacks any provisions implementing the changed

2    circumstances concerning the interstate allocation of water that has been reached between

3    Nevada and California, the key elements of which were incorporated by Congress into the

4    Settlement Act, and which become effective when TROA takes effect.  The public interest

5    is advanced by a modification of the Orr Ditch Decree that causes this interstate allocation

6    of water to become binding on both Nevada and California.

7    Subsequent to the Orr Ditch Decree, the Pyramid Tribe applied for and was granted

8    the right to the remaining unappropriated water of the Truckee River under Nevada Permits

9    48061 and 48494.  As a primary purpose of the Orr Ditch Decree is to protect Truckee

10   River water rights, the public interest is advanced by amending the Orr Ditch Decree to

11   both confirm and incorporate the Pyramid Tribe's claim to the water under Permits 48061

12   and 48494, so that the Tribe's rights to that water can be enforced under this Decree.  The

13   public interest is further advanced by amending the Orr Ditch Decree to recognize that the

14   waters of the Truckee River and its tributaries are fully appropriated and closed to new

15   appropriations.

16   The opposing parties argue that it is impossible to determine whether the proposed

17   modifications concerning the adoption of the TROA are suitably tailored to the changed

18   circumstances because the TROA is a long and complex document.  Having carefully

19   reviewed the TROA, the Court agrees it is a long and complex agreement.[3]  That

20   complexity, however, reflects the attendant complexity of establishing a management

21   framework for operating a river system (spanning two states) that is subject to both flooding

22   and drought conditions, the water of which is needed and used for both competing and

23   complementary beneficial purposes by numerous interested parties, including the

24   enhancement of spawning flows, carrying out the terms of the Preliminary Settlement

25   _____

26   [3]    The Court also finds the TRA to be a long and complex document, though not
as long and complex as the TROA.

9

1    Agreement, and ensuring that an owner of Decreed water rights receives the amount of

2    water to which that owner is legally entitled.  Further, and more significantly, the Court has

3    come to the firm conclusion that the complexity of the agreement results from the necessity

4    of creating a flexible management framework that is suitably tailored to both the changed

5    circumstances and the still changing circumstances of the river and the users of its water.

6    As TCID itself notes, the TROA is the result of over 20 years of the Moving Parties

7    negotiating each provision and operation, and the TROA itself reflects that its provisions

8    address the operation of the river system in the context of the changed circumstances.

9    Finally, despite the complexity of the TROA, the Court is of the firm determination that the

10   arguments of the parties, as well as the evidence presented, have been more than

11   sufficient to establish the understanding necessary to determine whether the proposed

12   modifications are suitably tailored to the changed circumstances.

13        The opposing parties also raise a more limited argument that the complexity of the

14   proposed management framework of the TROA renders it unsuitably tailored to certain of

15   the changed legal and factual circumstances because, when those specific circumstances

16   are considered individually, the circumstances can be accommodated with little or no

17   modification of the Orr Ditch Decree.  The changed circumstances, however, have not

18   occurred in isolation from other changes.  For example, the changed circumstance

19   resulting from the Court's decision in *Tribe v. Morton* may not, of itself, require modification

20   of the Orr Ditch Decree.  The decision, however, is relevant in considering the changed

21   circumstance of the Settlement Act's requirement that the operating agreement provide for

22   the enhancement of spawning flows.  Thus, while *Tribe v. Morton* requires the Secretary to

23   justify with precision any diversion of water, protecting the flow of water to Pyramid Lake,

24   the Settlement Act warrants changes suitably tailored to better timing that flow for a

25   beneficial purpose.  Thus, the Court has considered the suitability of the proposed

26

10

1  modifications of the Orr Ditch Decree against the context of the complex and diverse array

2  of competing and complementary changed circumstances.

3          Though the burden rests on the Moving Parties to show the proposed changes are

4  suitably tailored to the changed circumstances, the Court has considered the various

5  arguments of the opposing parties asserting reasons why the proposed changes are not

6  suitably tailored.  In considering these arguments, the Court has not shifted the burden to

7  the opposing parties to show the modifications are not suitably tailored.  The burden has, at

8  all times, rested with the Moving Parties to show the modifications are suitably tailored.

9  Nevertheless, in considering the opposing parties' arguments, the Court has considered

10  the merits of the arguments.

11          TCID and several of the individual responding parties have asserted various

12  arguments suggesting that the proposed changes are not suitably tailored because they

13  result in injuries to Decreed water rights.  As accurately stated by TCID in its opposition:

14          Both the *Orr Ditch Decree* and the Settlement Act contain provisions
           designed to protect the interests of water rights owners. The *Orr Ditch Decree*
15         provides that the points of diversion and the place and manner of use may be
           changed, so long as it is "without injury to the rights of other persons whose
16         rights are fixed by this decree." Ex. 13 p. 88.  Further, it prohibits anyone
           "from ever taking, diverting, using or claiming any of the water so decreed, in
17         any manner or at any time so as to in any way interfere with prior rights of any
           other persons or parties under this decree." Id at p. 87. The [Settlement Act]
18         (Ex.1), §210(b)(13) states:

19                  Nothing in this title is intended to affect the power of the
               Orr Ditch court or the Alpine court to ensure that the owners of
20             vested and perfected Truckee River water rights receive the
               amount of water to which they are entitled under the Orr Ditch
21             decree or the Alpine decree. Nothing in this title is intended to
               alter or conflict with any vested and perfected right of any
22             person or entity to use the water of the Truckee River or its
               tributaries, including, but not limited to, the rights of landowners
23             within the Newlands Project for delivery of the water of the
               Truckee River to Derby Dam and for the diversion of such
24             waters at Derby Dam pursuant to the Orr Ditch decree or any
               applicable law.

25

26

1    Likewise, TROA shall ensure water is stored and released . . . to satisfy the
2    exercise of water rights in conformance with the Orr Ditch decree . . ." Id,
     §205(a)(2)(D).

3    The Court would further note that Section 1.C.1 of the TROA expressly provides:

4         Pursuant to Section 210(b)(13) of the Settlement Act, nothing in this
          Agreement shall be construed to (a) affect the power of the Orr Ditch Court to
5         ensure that the owners of vested and perfected Truckee River water rights
          receive the amount of water to which they are entitled under the Orr Ditch
6         Decree; or (b) alter or conflict with any vested or perfected right of any Person
          to use the water of the Truckee River or its tributaries, including, but not
7         limited to, the rights of landowners within the Newlands Project for the
          delivery of Truckee River water to Derby Dam and for the diversion of such
8         water at Derby Dam pursuant to the Orr Ditch Decree or any applicable law.

9    In addition, Section 1.C.2 of the TROA establishes:

10        If the implementation of any provision or provisions of this Agreement
          would or does result in an owner of an Exercised Orr Ditch Decree Water
11        Right not receiving the amount of water to which that owner is legally entitled,
          the Administrator shall, as soon as practicable, (a) implement a remedy
12        mutually acceptable to affected parties, or (b) make up the amount of water to
          which the owner of the Exercised Orr Ditch Decree Water Right is legally
13        entitled, utilizing water of the Scheduling Party or Scheduling Parties who
          benefitted as a result of implementation of the provision or provisions of this
14        Agreement which caused such result.

15   In light of these provisions, the Court must conclude that the proposed modifications are

16   not suitable if they alter this Court's authority or power to ensure that owners of water rights

17   receive the amount of water to which they are legally entitled.  While TCID asserts several

18   times that it is the only party injured by the TROA, the Court's concern is not whether the

19   farmers represented by TCID are the only users of Decreed water rights that will be injured,

20   but whether they or any other owner of a Decreed water right will be injured.  In making this

21   determination, the Court has focused its considerations on whether the implementation of

22   any provision or provisions of the TROA, or the operation of the river system under the

23   TROA, will necessarily cause an injury or cause an injury that cannot be avoided,

24   particularly if implementation causes an injury that cannot be remedied.  Having considered

25   each of the arguments raised by the opposing parties, the Court finds that the adoption of

26   the TROA will not necessarily cause any such injury, or cause injuries that cannot be

1   avoided, or cause injuries that cannot be remedied.  Nevertheless, though the TROA will

2   not necessarily cause injury, the Court must also recognize that no management

3   framework for a complex river system, including the TRA, can eliminate all possibility of an

4   injury occurring.  That such "incidental" or "inadvertent" injuries are possible, however, does

5   not render the entire management framework unsuitable, unless the framework fails to

6   provide any remedy.  The TROA contains provisions pursuant to which an owner who is

7   injured because of the implementation of a provision or provisions of the Agreement is

8   entitled to a mutually acceptable remedy or to have the shorted water made up from the

9   water of the party that had benefitted.  These remedy provisions suitably protect Decreed

10   water rights, particularly as to incidental or inadvertent injuries resulting from the

11   implementation of a provision of the TROA.

12        An "injury" to a Decreed water right is not shown merely by establishing a shortage

13   of water because an owner of a water right can be shorted water without violating the Orr

14   Ditch Decree.  Similarly, alterations of historical flows do not, of themselves, establish

15   injury.  Rather, an injury occurs when the owner receives less water than the amount to

16   which the owner is legally entitled, which determination requires consideration not only of

17   the amount of the water duty, but also its priority, and certain other conditions affecting the

18   river system.  Owners of the most junior Decreed water rights may not be legally entitled to

19   receive any water when the amount of water in the river is insufficient to satisfy all Decreed

20   water rights.

21        TCID argues that operation of the river system under TROA will cause shortages in

22   the Newlands Project in violation of the Settlement Act and the Orr Ditch Decree.  In

23   support of this argument, TCID asserts that the Final Environmental Impact Statement /

24   Environmental Impact Report prepared for the TROA "expressly indicates that there will be

25   *additional* shortages to the Newlands Project *as a result of the operation of TROA*."

26   (Emphasis added).  The argument is without merit for several reasons.  First, the inquiry

1   required of this Court is not to determine whether non-injury shortages can occur if the river

2   system is operated under the TROA, but whether injuries will occur.  Under a pure priority

3   system, a junior right will suffer a shortage of water when the amount of water available is

4   insufficient to fully satisfy the needs of both the senior and the junior rights.  A managed or

5   regulated river system is not limited to ensuring that water is delivered according to

6   seniority of right, but promotes an efficient use of water that avoids a waste of water to the

7   detriment of a junior right.  Nevertheless, even on a managed river system, a junior right is

8   not injured when the full and proper exercise of a senior water right results in a shortage to

9   the owner of the junior right.  TCID's argument fails because TCID has argued only that the

10  FEIS/EIR shows additional shortages will occur, rather than arguing that the FEIS/EIR

11  shows that injuries will occur, or otherwise showing that the additional shortages will

12  constitute an injury.

13      Second, TCID has not even shown that additional shortages will occur under the

14  TROA.  TCID misplaces its reliance on the FEIS/EIR, and in particular on Figure 3.23, to

15  suggest that implementation of the TROA will cause *additional* shortages (regardless of

16  injury) to the Newlands Project.  A review of the FEIS/EIR establishes that the operations

17  model in Figure 3.23 was obtained by applying the water supply conditions existing during

18  two drought periods from 1931-35, and 1990-94, to various management systems,

19  including "No Action," and "TROA," in the context of projected water usage for the year

20  2033.  The "No Action" management system represents the current management system,

21  effectively management under the TRA, as it is the management system that will exist in

22  2033 if no action is taken and the TROA is not implemented.  The operations model also

23  includes the shortages that would have occurred during these drought periods in the

24  context of water usage and management in 2002, labeled as "Current."  TCID's argument

25  relies on improperly comparing the shortages occurring under the TRA for 2002 water

26  usage and those of the TROA for 2033 water usage.  The appropriate comparison is

14

between "No Action" and "TROA," which effectively compares the shortages occurring

under both the TRA and the TROA management systems in the context of projected water

usage for 2033, as applied to years of insufficient water supply that occurred during

drought periods of the last century.  Properly considered, Figure 3.23 of the FEIS/EIR

establishes that the Newlands Project would suffer additional water shortages as a result of

the projected changes in water usage between 2002 and 2033.  However, the extent of

those additional water shortages are nearly the same whether the river system is operated

under the TROA or continues under the current management system.  As such, and

contrary to TCID's argument, Figure 3.23 does not establish that the implementation of

TROA will cause *additional* shortages.  Rather, the additional shortages will occur

regardless of whether the river system is operated pursuant to the TRA or the TROA.

TCID also asserts that conditions that existed in 2008 and 2009 reveal that injuries

will occur under the TROA.  The argument is not well taken, as the argument omits critical

facts well-known to this Court arising from breach of the Truckee Canal in January 2008.

As a result of that breach, the Truckee Canal could not be used for any diversion for

several months.  When diversions could again occur, the amount that could be diverted

was limited by restrictions imposed by this Court.  In addition, while TCID establishes that

farmers experienced a shortage of water in 2008, and a flow of 75 cubic feet per second in

the Truckee Canal near the Wadsworth gage on July 31, 2009, TCID has not established

that any farmer was injured (that is, suffered a shortage in violation of the Orr Ditch Decree)

in either year, or that any farmer would have been injured in either of those years if the river

system was being managed under the TROA framework when the canal breach occurred.

TCID further argues that the TROA allows the use of "historical" flows in a fashion

that injures existing water rights in violation of the Orr Ditch Decree.  As this Court has

previously ruled, a junior right is not and cannot be injured by a change in an historical use

that precludes the diversion of water to which the owner of the junior right was never legally

1    entitled.  Absent the showing of a legal entitlement to historical flows, the alteration of those

2    flows under the TROA does not injure existing rights in violation of the Orr Ditch Decree.

3    TCID has not identified any provision of the TROA that will necessarily alter an historical

4    flow that will cause an injury to the owner of a Decreed water right.

5         TCID raises several arguments that certain provisions of the TROA permit changes

6    in water use in violation of the Orr Ditch Decree.  For example, TCID asserts that

7    implementation of §§7.A.4(b)(3) and 7.C.1 violates the Orr Ditch Decree because the

8    provisions improperly allow the conversion of a non-consumptive use of water for power

9    generation to the consumptive use of Fish Credit Water.  These arguments are without

10   merit, as the provisions do not "permit" a change that violates the Orr Ditch Decree, but

11   rather (a) identify *proposed* changes that the signatory parties agreed would be useful if

12   TROA takes effect, but that are not necessary for TROA to take effect, and (b) establishes

13   duties related to obtaining the necessary approvals for these changes in accordance with

14   applicable law.  As to these provisions, the appropriate forum to determine whether the

15   proposed changes will violate the Orr Ditch Decree are the change application proceedings

16   that commence before the State Engineer, and are reviewed by this Court.[4]

17        Likewise, TCID's argument that the TROA's provisions allowing storage of the river

18   system's most junior water rights as Fish Credit Water or Water Quality Credit Water,

19   which have been awarded to the Tribe, might in some cases "unfairly" give those junior

20   rights a better and more reliable supply of water than the Claim 3 rights used for the

21   Newlands Project.  The appropriate inquiry, however, is whether the water can be stored

22   without injury to a Decreed water right, not whether the Tribe obtains a benefit by storing

23   the water that it is legally entitled to divert under the system's most junior water rights.  That

24   _____

25        [4]     TCID raises a similar argument that the TROA violates the "25% Rule."  The
     argument fails for several reasons, not the least of which is that the State Engineer and this
26   Court have already ruled against TCID on this issue.

1  the storage of the water benefits the flow of the river for fishery and water quality purposes

2  further suggests that the proposed changes are suitably tailored to the changed

3  circumstances.

4        TCID also appears to make an argument that the storage of the consumptive use

5  portion of a water right will cause an injury by altering the timing of flows that would

6  otherwise be available for diversion.  The argument is without merit.  The timing of the

7  return flows cannot be altered by the storage of the consumptive use portion of a water

8  right.  Return flows are, by definition, comprised solely of the non-consumptive portion of

9  the water right and thus are not stored.  Rather, the non-consumptive portion of a water

10  right remains in the river for diversion by those legally entitled to divert the water.  Further,

11  as only the consumptive-use portion is stored, no owner of other water rights will be legally

12  entitled to divert the water when it is later released, and thus they cannot be injured by the

13  timing of its release.

14        TCID's argument that the TROA violates the Tahoe-Prosser Exchange Agreement is

15  without merit.  That agreement was incorporated by the Truckee River General Electric

16  Court into the Truckee River General Electric Decree.  Thus, the appropriate forum for that

17  argument is the Truckee River General Electric Court.  (The Court would note, however,

18  that the Moving Parties were required to submit, and have submitted, the TROA to that

19  court for any necessary modifications to that decree.  The Truckee River General Electric

20  Court has approved the proposed modifications of that decree, thus determining that TROA

21  does not violate the Tahoe-Prosser Exchange Agreement.)

22        TCID argues that the usage of Donner Lake cannot occur as envisioned in the

23  TROA, because TCID and TMWA jointly own the rights to store water in Donner Lake.

24  TCID asserts that the TROA, however, treats water stored in Donner Lake as if the right

25  was partitioned.  As both TCID and the Moving Parties acknowledge, the issue of whether

26  the water can be partitioned is currently in litigation, with an interlocutory judgment of

17

partition having been entered, but appealed.  As the Moving Parties point out, however, the TROA's provisions for Donner Lake expressly provide that they do not control or alter the operation and obligations of TMWA and TCID with respect to Donner Lake, but rather that those provisions will only control if TMWA and TCID agree, or (absent an agreement) to the extent provided for in an order entered by a court of competent jurisdiction.  Thus, contrary to TCID's argument, the TROA, itself, limits the implementation of its provisions for the usage of Donner Lake to that permitted by agreement or by a ruling of a court of competent jurisdiction.

Though the Court has not addressed every argument raised by each party individually, the Court has considered all arguments raised by all parties, including those who have individually participated in this motion.  The arguments have assisted the Court in assessing the modifications proposed to the Orr Ditch Decree, and particularly in gaining a sufficient understanding of the TROA and its provisions to make this determination. Having considered all of the arguments, the Court concludes that it has authority to modify all provisions of the Orr Ditch Decree, that legal and factual circumstances have changed since the Orr Ditch Decree was entered, that those changes warrant modification of the Orr Ditch Decree, and that the proposed modifications, while complex and extensive, are suitably tailored to the extensive changes that have occurred, which changes reflect and establish the need to modify the existing operating framework for managing a complex river system to provide a flexibility necessary to manage water rights for competing and complementary uses, while also ensuring the protection of existing Decreed water rights. Accordingly, for good cause shown,

THE COURT **ORDERS** that the Moving Parties' Amended Motion to Modify or Amend the Final Decree Entered in this Case in 1944 (#1173) is GRANTED; For clarity, the Court will enter the order modifying the Orr Ditch Decree separately;

1    THE COURT FURTHER **ORDERS** that the Motion for Case Management

2    Conference (#1510) is DENIED as moot.

3

4    DATED this _30_ day of September, 2014.

5

6                                         Lloyd D. George
                                          United States District Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

19